1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel Feder (SBN 130867)
**LAW OFFICES OF DANIEL FEDER**
332 Pine Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 391-9476
Facsimilie: (415) 391-9432

Attorneys for Plaintiff
RACHELLE GULI

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

RACHELLE GULI,

      Plaintiff,

v.

UNITED STATES ATTORNEY'S OFFICE
OF THE NORTHERN DISTRICT OF
CALIFORNIA

      Defendants.

**PLAINTIFF'S FIRST COMPLAINT FOR DAMAGES FOR:**

1. Race, Sex and National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C, Section 2000e, et seq.
2. Retaliation in Violation of 24 U.S.C, Section 2000e(3)(a).
3. Discrimination in Violation of the Uniformed Services and Reemployment Rights Act, Title 38, U.S.C, Sections 4301-4333.
4. Retaliation in Violation of California Labor Code Section 98.6 and Civil Code 1102.5
5. Violation of California Labor Code §226.7 (Failure to Provide Meal and Rest Breaks)
6. Violation of California Labor Code (Failure to Pay Overtime Wages)
7. Violation of California Labor Code (Willful Failure to Pay Wages Upon Separation)
8. Violation of California Labor Code (Failure to Provide Accurate Itemized Wage Statements and to Maintain Adequate Records)

**DEMAND FOR JURY TRIAL**
**DEMAND FOR PUNITIVE DAMAGES**

Plaintiff RACHELLE GULI ("Plaintiff") alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this civil action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e-16.

2.      Venue is proper in this judicial district under 42 U.S.C. section 2000e– 5(f) (3), and 5 U.S.C. section 7703(b) (2).  Plaintiff was employed by the United States Department of Justice in the Northern District of California at the time of her termination, Plaintiff's employment records are maintained by the Department of Justice in this judicial district, and the decisions adverse to Plaintiff's employment that are the subject of the civil action were made in this judicial district.

## PARTIES

3.      Plaintiff Rachelle Guli ("Plaintiff") is a Filipino female who is gay and married.  Plaintiff was the Supervisory Information Technology Specialist (Systems Manager) for the Defendant United States Attorney's Office of the Northern District of California ("Defendant" or "USAO").  Plaintiff worked for the USAO from August 10, 2014, to January 8, 2015.  Complainant supervised 5 Information Technology Specialists, assisted with projects and insured systems and network operability.  Brian Wickett ("Wickett") was plaintiff's supervisor.  His position was that of Security Manager.  Mr. Wickett was supervised by Mary Cooper, an Administrative Officer.

4.      Plaintiff is gay.  She is married to a woman.  In October, 2014, she informed management representatives of her sexual orientation and marital status.  Plaintiff is Filipino

5.   Plaintiff is informed and believes, and thereon alleges, that Defendant was at all times relevant herein the agent, servant, employee, and/or representative of each of the other Defendants, and in doing the acts and things alleged in this complaint was acting within the course and scope of such agency, service, employment and/or representation.  Plaintiff is further informed and believes and thereon alleges that Defendant is the employers of the managers and supervisors herein complained of, and supervising over Plaintiff, and therefore Defendant, and each of them, are jointly and severally responsible and liable to Plaintiffs for the damages hereinafter alleged.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.      Plaintiff filed a timely charge of discrimination with the EEOC.  Plaintiff also filed an EEO

complaint with the Department of Justice, which has been investigated.  The DOJ has issued a letter giving Plaintiff the right to sue in federal court.

### GENERAL FACTUAL ALLEGATIONS

7.      Plaintiff was hired on August 10, 2014 as the new CAN System Manager.  Since being hired, Plaintiff worked from 9:00am to 6:00pm every day without taking a lunch period or breaks.  Plaintiff brought her lunch in and worked while eating. Plaintiff's supervisor Wickett told Plaintiff on her first week that her scheduled hours were from 9:00am to 6:00pm.  Wickett stated on several occasions that Plaintiff's job doesn't have a set a number of hours.  Plaintiff complained to Wickett several times about not being allowed to take meal or rest breaks, but Wickett would not respond to her complaints, or otherwise dismissed them.

8.      After being hired, Plaintiff and Plaintiff's subordinates noticed and made her aware of the difference in treatment she received from her predecessor Smita Patel, who, happened to be in the office on her first week, despite her leaving the position a year and half prior.  Plaintiff's supervisor was not providing her with the support he had provided to Smita Patel, his previous Systems Manager.

9.      The office where Plaintiff worked is located in the "Tenderloin/Little Saigon" part San Francisco, which is a rough neighborhood.  It's filled with drug dealers, drug addicts, and homeless people as well as Vietnamese-American businesses and families.  Throughout her employment with the Defendant, Plaintiff lived about 3 blocks away from the office.  On several occasions, Wickett stated, in front of people, including Plaintiff's subordinates, when referring to the bad things like car robberies, general crimes, and drug deals that occurred, how these people in the neighborhood are "my people."

10.     During Plaintiff's first few weeks on the job, the supervisor made statements like, "You weren't the best suited for the job, but we had to hire you because of your Vet status and it's a plus that you live nearby."

11.     On or around Plaintiff's first week on the job, Plaintiff told her Wickett that she was being seen at the VA for her medical care, he told Plaintiff that he hadn't filed for any VA benefits and made her feel like she was wrong for getting care through the VA.

12.     After a couple of weeks of working there, Plaintiff decided to bring in some personal effects

into her office space to include a photo of Plaintiff's wife, Elizabeth.  Plaintiff put the photo on her desk and Plaintiff believes that was the first time that her supervisor found out that Plaintiff is married to a woman.  After that, Wickett's behavior toward Plaintiff changed from being kind and somewhat responsive, to unavailable.

13.      Plaintiff had pre-approved scheduled leave on Thursday, September 25 and Friday, September 26 because of an out of town wedding that was planned months in advance.

14.      On September 24, Plaintiff's supervisor Wickett left the office early at approximately 4:00pm-4:10pm, because he was also going to be out of town for those two days.

15.      At or around 4:45-5:15pm, Plaintiff left the office to go two blocks away to a pharmacy to pick up a prescription.  Plaintiff thought it was all right to leave since the pharmacy was close by and she would be returning to work to close out the day prior to her taking leave and going out of town.   Due to the workload that day, Plaintiff did not take a lunch break.

16.      After leaving the office, Wickett sent Plaintiff an email (which Plaintiff received on her iPhone) to give him a call.  Plaintiff called Wickett and he asked Plaintiff to assist his supervisor, AO (Mary Cooper) with locating a document in a network drive.  Plaintiff never told him she was heading to the pharmacy to pick up a prescription.  Plaintiff told him she would help Mary, he told Plaintiff the location of the file Mary Cooper needed assistance with, and then ended the phone conversation. Plaintiff arrived back into the office, and started looking for the location of the file Mary Cooper needed assistance with.  Plaintiff couldn't find it.   Plaintiff started walking towards Mary's Office to let her know where Wickett told her the file was located, her office door was open but she was not there. Plaintiff proceeded to walk around the premises to look for her.  Plaintiff also tried to phone Brian from her office on his cell phone to ask for help, but he did not answer.  Plaintiff spoke to Michael Ellis to ask him if he's seen Mary Cooper.  Mr. Ellis stated he had not.  Eventually Plaintiff saw Mary Cooper leaving the office directly next to hers that belongs to Peggy Hurdle (which was closed when Plaintiff passed by earlier).  Mary said she did not need my help after all.  Plaintiff went back to my office, and tried to contact Wickett again.  He did not answer.  Plaintiff then wrote him an email stating that Mary did not need assistance.  Plaintiff finally left the office around 6:50-7:00pm, well after her tour of duty

ended.

17.     Plaintiff was questioned about her whereabouts for September 24th on three separate occasions prior to the meeting with the Human Resources Department and Wickett.

18.     During the first meeting, which occurred Monday 9/29, Wickett told Plaintiff that people perceive Plaintiff as being on personal devices often and that he does not feel like she is on his team. Plaintiff explained to him that she brought in her personal computer because Plaintiff was trying to get Remote Access on it to function, so Plaintiff can log into the network from home.  Also, Plaintiff would bring in her iPad to work because she downloaded into ibooks, the several policies and guides that she needed learn for her job.  Plaintiff thought this was an environmentally-friendly way to get the job done. He asked Plaintiff about what happened that day, and Plaintiff told him what she remembered.  Plaintiff told him the times she was stating were an estimation and that she wasn't sure exactly when she left and came back.  Plaintiff also apologized for her not communicating with him about leaving the office to run a personal errand.  Wickett ended the meeting by saying "we're good, please put in annual leave for the time you were away at the pharmacy."  He also sent Plaintiff an email reminding her to put a leave request in and Plaintiff responded, letting him know that she had already made the request.

19.     On Tuesday 9/30, Brian sent Plaintiff an email saying, "Can you tell me how you came up with the times that you submitted?" Plaintiff then told him that she felt like was walking on eggshells, and that he was causing her stress.  Plaintiff also stated to him that if he believed she was doing something wrong, please provide guidance.   He came to Plaintiff's office and asked her several more of the same questions that he asked Plaintiff the day before, most of the questions focusing on the time that Plaintiff technically wasn't on duty.  He also assured Plaintiff he didn't want to seem "accusatory" and that he just wanted to understand what happened that day.  During this meeting, he stated that he thought Plaintiff's work hours were from 9:00am to 5:30pm.  Plaintiff said to him "that is news to me".  She also stated that his actions were not only intimidating,  but she also felt he was interrogating her and if Plaintiff had done something wrong, he needs to tell her.  He explained that his Security Police background from the Air Force is what's making him dig deeper into incidents.  Again, he ended the conversation with "we're good".  Plaintiff left his office feeling like the issue was resolved.  At this

point, he still hadn't approved Plaintiff's leave.

20.     By this point, he was cold and closed off to Plaintiff.  His door, which was often open, was closed for most of the day and week.  He barely spoke to Plaintiff unless it was absolutely necessary.

21.     On Friday, October 3rd, after Plaintiff sent him an IM about being unable to validate her timesheet (because he didn't approve Plaintiff's leave), he asked Plaintiff to come to his office only to ask the same questions again.  This time, he had a typed piece of paper in which he was writing notes. He again ended the conversation with "we're good".  He asked Plaintiff to provide him a receipt of the prescription payment from the pharmacy she went to, which Plaintiff provided to him on Saturday morning.  Plaintiff asked him about her timesheet and he told Plaintiff not to worry about it.  Plaintiff told him that the technique he was using to question her was making Plaintiff feel uneasy and uncomfortable.  He didn't respond.  At this point, he still had not told Plaintiff that she had done anything wrong.

22.     The entire day on Monday October 6, he did not say anything to Plaintiff and was in his office with his door closed the entire time.  Plaintiff received a notification from HR about her timesheet not being validated, and Plaintiff told HR to consult with her supervisor, Brian Wickett.

23.     On Tuesday 10/7, after several emails from HR about Plaintiff's timesheet not being validated, Wickett marked Plaintiff as AWOL (Absent without Leave) on her timesheet for an hour and a half and also approved her requested leave for 30 minutes.  After listing Plaintiff as AWOL, he sent Plaintiff an email telling her if she had questions, Plaintiff could meet with him and HR on Wednesday to discuss.

24.     This occurred without Plaintiff's knowing of his justification or having a clear and concise conversation or documentation reflecting that Plaintiff had done anything wrong.  Plaintiff requested for him to push the meeting back to Friday, and he agreed.

25.     On Friday, 10/10 at 2:00 p.m., Plaintiff meet with Wickett and HR regarding him charging her with being AWOL.  Wickett  immediately started  asking Plaintiff again what occurred on September 24.  Plaintiff interrupted him mid-sentence as he brings up the times Plaintiff was here after her tour of duty ended and Plaintiff requested that we not talk about what occurred after her tour of duty as she was not on compensatory time or AWS.  Therefore, Plaintiff was not required to be here after her tour of

duty. He immediately started raising his voice and shuffling around in his chair making Plaintiff feel very threatened and intimidated. Plaintiff also noticed the HR officer move away slightly from him. Plaintiff told him the only time that is relevant in regards what transpired and what Plaintiff is accountable for on that day is the time she departed the office.

26. HR and Wickett then started asking Plaintiff why she put in the leave for 30 minutes covering the period of 5:15pm-5:45pm. Plaintiff told both of them that Plaintiff put that leave in for that timeframe because she was told her hours were from 9am to 6pm and Plaintiff thought that period would cover the trip to the pharmacy. Plaintiff told them that she didn't know exactly when she left and that she was only made aware in the meeting with Brian on Tuesday, September 30th that her hours were actually from 9:00am to 5:30pm.

27. At this point, Wickett was livid. He pulled out a piece of paper from his notes and started reading it out loud to Plaintiff. It basically said that he is giving Plaintiff seven days to resign and if she doesn't then she will have to deal with his proposed serious discipline for her misconduct. Plaintiff asked him for a copy of that letter. He gave Plaintiff the sheet of paper he read from. The letter never stipulated exactly what Plaintiff did, and was very threatening. It also wasn't written on agency letterhead and it did not have his signature on it. He then asked Plaintiff if she had questions, Plaintiff told him she did. Plaintiff asked him why he kept questioning Plaintiff about what occurred after her tour of duty. He said "because you were supposed to be there." Plaintiff then asked, "was I supposed to be on compensatory time and not know it?" He said "no." Then Plaintiff asked him that if I wasn't on comp time, and he didn't tell me to put in for comp time, why he felt I was required to be there. He didn't answer. He was angry and threw his body to the back of his chair. He was making fists and pounding the table and yelling, "This is ridiculous." Plaintiff asked him if he ever heard her say, "I volunteer to work past my tour of duty." He didn't answer. He then threw an object across the room. Plaintiff was not sure what it was but she heard it fall onto the carpet nearby her. That's when Plaintiff told him that his threatening mannerisms were making her feel uncomfortable and threatened.

28. Plaintiff then asked the HR representative, "Is it unlawful, according to OPM, FLSA and Department of Labor guidelines and regulations to make an employee work past their 8 hours of duty,

off-the-clock, if they are not on comp time or an Alternate Work Schedule." Jeneal responded by saying, "no, it's not unlawful, it's expected." Plaintiff wrote down her answer. Brian then interrupted my next question by yelling "we're done, I'm not answering any more questions." Plaintiff then told him that she had more questions to ask and he stated that he didn't care and for Plaintiff to leave the room. He yelled, "Get out" while pointing to the door. Plaintiff looked at Jeneal and asked her if Plaintiff can ask her more questions later after the meeting, and she said "yes."

29.     After about 15 minutes, Plaintiff received a phone call on her government iPhone from Brian. He ordered Plaintiff to come to her office, and Plaintiff told him she would be right there after Plaintiff attended to another's employee's request for help. Plaintiff went to her office and Jeneal and Brian were there and closed the door. They then asked Plaintiff if it's ok for them to charge Plaintiff's lunch between 5:15pm and 5:45pm (after my tour of duty ended) and for time Plaintiff was away, they will mark her as AWOL, a total of 45 minutes. Plaintiff told them that it wasn't her call.  Plaintiff then reiterated to them that it was established in the meeting that Plaintiff's tour of duty on that day was from 9am to 5:30pm. They also stated that Plaintiff was allowed to talk to anyone in the office about the meeting that transpired earlier. He then sent an email with the same information.

30.     After the email was sent, Plaintiff went to Jeneal's office and ask her how it's possible Plaintiff was being charged lunch from 5:15pm to 5:45pm after her tour of duty ended. She said that lunch is overlapping the leave Plaintiff put in originally. Plaintiff told her it was established in the meeting that Plaintiff's day ended at 5:30pm that day, and that the leave was put in prior to Plaintiff being informed of my actual tour of duty. She said it wasn't her call to change it and she would have to wait until her meeting with Mary Cooper.

31.     For approximately two weeks after the meeting, Wickett made Plaintiff feel uncomfortable, stressed, intimidated and made the work environment very hostile. He continued his psychological assault even after Plaintiff informed him of how he was making her feel. This entire ordeal affected Plaintiff at work and at home. Plaintiff had not been getting adequate sleep and she has since reached out to a counselor within the Employee Assistance Program (for the stress and anxiety she was feeling) and was advised to contact EEO and OSC.

32.     Plaintiff was given a notice of intent to terminate her employment by Wickett and was subsequently terminated on January 8, 2015 because of her race, sex and national origin, her military service, her complaints about Defendants' illegal wage and hour practices, the unfairness of her write-ups, and the harassing and intimidating conduct by Wickett.

## FIRST CLAIM
### (Race, Sex and National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e., et seq.)

33.     Plaintiff realleges and hereby incorporates by reference paragraphs 1-32 as though fully set forth herein.

34.     Title VII of the U.S.C. prohibits unlawful employment practices by employers.  See 42 U.S.C. section 2000 (e) (2) (a)-(d);   Title VII applies to federal employment.  See 42 U.S.C. section 2000 (e) (16). The Defendant Department of Justice was Plaintiff's employer, as defined by 42 U.S.C. section 2000 (e), et seq.

35.     Plaintiff was an "employee" of Defendant Department of Justice as defined in 42 U.S.C. section 2000 (e)(f).

36.     By committing the actions alleged herein, Defendant subjected Plaintiff to discrimination based on her (race), (sex), (national origin), in violation of 42 U.S.C., Section 2000e-2, relating to the terms and conditions of her employment, as defined in 42 U.S.C. section 2000e-2(a)(1).

WHEREFORE, Plaintiff requests relief, including punitive damages, as more fully set forth below.

## SECOND CLAIM
### (Retaliation in Violation of 42 U.S.C, Section 2000e-(3)(a))
[Against All Defendants]

37.     Plaintiff realleges and hereby incorporates by reference paragraphs 1-36 as though fully set forth herein.

38.     Title VII specifically prohibits retaliation against employees who engage in protected activities.  42 U.S.C. section 2000e(3)(a).  Plaintiff complained about discrimination and other unlawful conduct to her supervisors.  As a direct result of her complaints, Defendant subjected her to adverse

employment actions, including termination, causing her to suffer damages and emotional distress.

WHEREFORE, Plaintiff requests relief, including punitive damages, as more fully set forth below.

**THIRD CLAIM**
**(Violations of the Uniformed Services Employment and Reemployment Rights Act, Title 38, United States Code, Sections 4301-4333)**
[Against All Defendants]

39.    Plaintiff realleges and hereby incorporates by reference paragraphs 1-38, as though fully set forth herein.

40.    The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C., Sections 4301-4333 prohibits discrimination against service members in employment.  Under the USERRA, any person who is in any manner connected to the United States Uniformed Forces shall not be denied initial employment, reemployment, and retention in employment, promotion or any other benefit of employment by an employer on the basis of that membership or service.

41.    Defendant discriminated against Plaintiff in the terms and conditions of her employment, and terminated her on the basis of her membership in the United States Uniformed Forces in violation of USERRA.

WHEREFORE, Plaintiff requests relief as set forth below.

**FOURTH CLAIM**
(Retaliation in Violation of California Labor Code §1102.5 and §98.6)

42.    Plaintiff re-alleges and herein incorporates by reference, each and every allegation in paragraphs 1-40.

43.    At all times during Plaintiff's tenure with Defendant, and/or DOES 1-41, and each of them, California Labor Code § 1102.5, in relevant part, prohibited an employer from retaliating against an employee for complaining about or refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation. At all such times, Labor Code Section 98.6 prohibited an employer from retaliating against any employee for complaining about any violations of the Labor Code.

44.    Plaintiff complained about and refused to participate, based on a reasonable belief, in Defendants and each of their unfair labor practices and their efforts to defraud their bank, the IRS and others.   Defendant, and each of them, violated California law when they terminated Plaintiff in retaliation for her numerous complaints regarding the illegal conduct to which she was subjected throughout her employment As a direct, proximate, and foreseeable result of Defendant's, and each of their, acts and/or failures to act, as alleged herein, Plaintiff has suffered and continues to suffer substantial losses in earnings and employment benefits, injury to her career and reputation, and extreme and enduring emotional distress including but not limited to humiliation, shock, embarrassment, fear, anxiety and discomfort, all of which amount to Plaintiff's damage which totals in excess of the minimum jurisdiction of this court, the precise amount to be proven at trial.

45.    Defendant and each of them, committed the acts herein alleged maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice, in conscious disregard for Plaintiff's rights and thus an award of exemplary and punitive damages is justified.  Further, the actions directed at Plaintiff were carried out by supervising employees acting in a deliberate, callous and intentional manner in order to injure and damage Plaintiff.  Plaintiff is therefore entitled to recover and herein prays for punitive damages in an amount sufficient to punish Defendant, and/or DOES 1-50 and each of them, in an amount to be proven in trial.

WHEREFORE, Plaintiff prays for judgment, including punitive damages, as more fully set forth below.

## FIFTH CLAIM
### VIOLATION OF CALIFORNIA LABOR CODE
§ 226.7; 8 C.C.R. §§ 11090, et seq. (*Meal Period Violations*)

46.    Plaintiff  re-alleges and incorporates by reference, each and every allegation in paragraphs 1-45.

47.    Throughout the statutory period, Plaintiff was regularly scheduled to work, and did work, periods sufficient to require Defendants to provide Plaintiff with a meal period pursuant to the Labor Code and applicable IWC Wage Orders.

48.   Throughout the statutory period, on a significant portion of work days, Defendants failed to provide Plaintiff with a meal and/or rest breaks in accordance with Labor Code section 226.7 and applicable Industrial Welfare Commission ("IWC") wage orders.

49.   As a result of Defendants failure to provide Plaintiff with meal and/or rest periods in accordance with Labor Code section 226.7 and applicable IWC wage orders, Defendants owe Plaintiff and other current and former employees of Defendants one hour of wages per violation and statutory and civil penalties in an amount to be proven at trial.

50.   These wages were due in accordance with Labor Code section 204.  Defendants' willfully failed to pay these wages when owing.

WHEREFORE, Plaintiff prays for judgment as more fully set forth below.

### SIXTH CLAIM
VIOLATION OF CALIFORNIA LABOR CODE §§ 510(A), 201,
11010-11130, 1160, ¶3(A), IWC 5-2001
FAILURE TO PAY OVERTIME WAGES

51.   Plaintiff re-alleges and hereby incorporates by reference paragraphs 1-50 as though fully set forth herein.

52.   Plaintiff was employed by and performed work for Defendant.  Defendant intentionally misclassified Plaintiff as exempt and willfully did not pay Plaintiff for all hours worked.  DEFENDANT owes Plaintiff wages under the terms of her employment, in an amount to be proven at trial.

53.   DEFENDANT's Status as an Employer. Section 2 of the applicable Wage Order defines "employer" as any person who "directly or indirectly, or through an agent or any other person, employs or exercised control over the wages, hours, or working conditions of any person."  California Labor Code § 350 defines "employing" as "hiring, or in any way contracting for, the services of an employee." DEFENDANT meets this definition with respect to Plaintiff who performed services for DEFENDANT.

54.   DEFENDANT effectively controlled the employment of Plaintiff and knows or should have known that Plaintiff had been and continued to be routinely underpaid for her labor.

55.   During all relevant time periods during her employment, Plaintiff spent less than 50% of her time performing managerial related activities.

56.   California Labor Code §§ 11010-111430, 1160, ¶3(A) and the applicable Wage Orders provide that nonexempt employees must receive: "(a) One and one half (1 ½) times [her] regular rate of pay for all hours worked in excess of eight (8) hours up to and including twelve (12) hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and (b) Double [her] regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours wo9rked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek."

57.   At all times relevant, Defendant was aware of and was under a duty to comply with various provisions of the California Labor Code and/or Wage Orders issued by the IWC.

58.   By refusing to compensate Plaintiff for all wages earned, Defendants violated those California Labor Code and IWC Wage Order provisions, cited herein.  Defendants' violations of those California Labor Code and IWC Wage Order provisions were willful.

59.   As a result of DEFENDANT's misclassification of Plaintiff as exempt, DEFENDANT failed to provide Plaintiff with overtime and compensation in amounts to be determined at trial, and she is therefore entitled to recover of such amounts, plus interest thereon, attorneys' fees, and costs, under California Labor Code § 1194.

WHEREFORE, Plaintiff requests relief as more fully set forth below.

## SEVENTH CLAIM
### VIOLATION OF CALIFORNIA LABOR CODE §§ 201, 202, 203, 218, 1194
### WILLFUL FAILURE TO PAY ALL WAGES UPON SEPARATION

60.   Plaintiff re-alleges and hereby incorporates by reference paragraphs 1-59 as though fully set forth herein.

61.   Plaintiff was employed by Defendant DEFENDANT, performed work for Defendant DEFENDANT, and as detailed herein was not paid all wages due.  Plaintiff was terminated on or about January 8, 2015.  Since that time Defendant DEFENDANT has willfully continued to fail to pay Plaintiff for all wages owed her, and consequently, owe Plaintiff thirty days of pay in an amount to be proven at trial.

62.   Plaintiff is informed and believes that Defendant's failure to pay all wages upon separation was willful.  As a consequence of Defendant DEFENDANT's willful failure to pay all wages upon

separation, Defendants are subject to civil and statutory penalties for its conduct directed at Plaintiff.

WHEREFORE, Plaintiff requests relief as more fully set forth below.

### EIGHTH CLAIM
**VIOLATION OF CALIFORNIA LABOR CODE
§§ 226 & 1174 and WAGE ORDER 5-2001
FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE
STATEMENTS AND MAINTAIN ADEQUATE RECORDS**

63.     Plaintiff re-alleges and hereby incorporates by reference paragraphs 1-62 as though fully set forth herein.

64.     Pursuant to Labor Code §§ 226 and 1174, and the recordkeeping provisions of Wage Order 5-2001, DEFENDANT is required to maintain an accurate record of each employee's hours of work s each workday for a period of at least three (3) years, and provide each employee with accurate, period wage payments in writing setting forth, amount other things: (a) the dates of labor for which payment of wages is made; (b) the total hours worked for a pay period; (c) the applicable rates of pay for all hours worked; (d) gross and net wages paid, as well as authorized deductions from those wages; and (e) the name and address of the employer.

65.     DEFENDANT has knowingly failed to comply with California Labor Code §§ 226 and 1174 by, among other things, failing to provide accurate itemized wage statement in writing showing all applicable rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by Plaintiff; (b) failing to show the dates of labor for which payments are or were being made; (c) failing to provide complete and/or accurate information concerning deductions that are or have been taking from Plaintiff's wages.

66.     As a result of DEFENDANT's failure to comply with California Labor Code § 226(a), and pursuant to California Labor Code § 226(e), Plaintiff is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial period in which a violation occurred, and on hundred dollars ($100) for each violation in each subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000).

67.     Plaintiff is further entitled to an award of costs and reasonable attorneys fees pursuant to California Labor Code §§ 226(e) and (g).

1
2
3
4

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1.     Back Pay in the amount she would have earned absent discrimination from the time of the

adverse action until the date of trial.  42 U.S.C. section 2000(e)-(5)(g).

2.     Front Pay to compensate her for the lost compensation she would have earned had she not been

subjected to discrimination and the other conduct alleged herein.

3.     Costs and reasonable attorney's fees incurred in this lawsuit with interest thereon pursuant to

42 USC Section 2000e-5(k).

4.     Unpaid wages and penalties based on the wage and hour violations.

5.     Such other relief that the Court deems just.  .

**DEMAND FOR JURY TRIAL**

Plaintiff Rachelle Guli hereby demand a trial by jury for each and every claim for which she

has a right to jury trial.

DATED:  July 16, 2015                          Law Offices of Daniel Feder


                                        By: _____/s/_____
                                            Daniel Feder
                                            Attorneys for Plaintiff Rachelle Guli

*Complaint for Damages*
U.S. District Court Case No. _____